AO 243 (Rev. 5/85)

**MOTION UNDER 28 USC § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY**

| **United States District Court** | **District** SOUTHERN DISTRICT OF FLORIDA | |
|---|---|---|
| Name of Movant<br>YAHWEH BEN YAHWEH | Prisoner No.<br>22031-034 | Case No. 90-868-Cr-<br>ROETTGER |
| Place of Confinement<br>USP LEWISBURG | | |

UNITED STATES OF AMERICA      V.      YAHWEH BEN YAHWEH, ET AL

(name under which convicted)

## MOTION

1. Name and location of court which entered the judgment of conviction under attack  The United States District Court for the Southern District of Florida sitting in Ft. Lauderdale, Florida.

2. Date of judgment of conviction  The jury verdict was received on May 27, 1992, and the Movant was sentenced on September 14, 1992.

3. Length of sentence  18 years.

4. Nature of offense involved (all counts)  Three Count Indictment.  Count I – Conspiracy to commit R.I.C.O. 18 U.S.C. Section 1961(4); Count II – Conducting and Participating in Affairs of Enterprise through a Pattern of Racketeering 18 U.S.C. Sections 1962(c) and 1963; Count III – Obstructing, Delaying, and Affecting Interstate Commerce through Extortion 18 U.S.C. Section 1951.

5. What was your plea? (Check one)
   - (a) Not guilty   ☒ as to all counts
   - (b) Guilty   ☐
   - (c) Nolo contendere   ☐

   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
   - (a) Jury   ☒
   - (b) Judge only   ☐

7. Did you testify at the trial?
   Yes ☒ No ☐

8. Did you appeal from the judgment of conviction?
   Yes ☒ No ☐

CAT B 1:96CV2857 NCR

LSS

(2)

AO 243 (Rev. 5/85)

9. If you did appeal, answer the following:

   (a) Name of court __11th Circuit Court of Appeals__

   (b) Result __Conviction affirmed__

   (c) Date of result __January 4, 1996__

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions with respect to this judgment in any federal court?
    Yes ☒ No ☐

11. If your answer to 10 was "yes," give the following information:

    (a) (1) Name of court __U.S. District Court, Southern District of Florida__

        (2) Nature of proceeding __Motion for New Trial__

        (3) Grounds raised __Discovery Violations under Brady, Prosecutors' Failure to Correct Known False__
        __Testimony, and Newly Discovered Evidence__

        (4) Did you receive an evidentiary hearing on your petition, application or motion?
            Yes ☒ No ☐

        (5) Result __Motion denied__

        (6) Date of result __April 4, 1995__

    (b) As to any second petition, application or motion give the same information:     N/A

        (1) Name of court _____

        (2) Nature of proceeding _____

        (3) Grounds raised _____

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐ No ☐

(5) Result_____

(6) Date of result _____

(c) Did you appeal, to an appellate federal court having jurisdiction, the result of action taken on any petition, application or motion?
(1) First petition, etc.        Yes ☒ No ☐    as to the Motion for New Trial.
(2) Second petition, etc.    Yes ☐ No ☐

(d) If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

N/A _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

12. State *concisely* every ground on which you claim that you are being held in violation of the constitution, laws or treaties of the United States. Summarize briefly the facts supporting each ground. If necessary, you may attach pages stating additional grounds and facts supporting same.

CAUTION: If you fail to set forth all ground in this motion, you may be barred from presenting additional grounds at a later date.

For your information, the following is a list of the most frequently raised grounds for relief in these proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you have other than those listed. However, you should raise in this motion all available grounds (relating to this conviction) on which you based your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The motion will be returned to you if you merely check (a) through (j) or any one of the grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily or with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

AO 243 (Rev. 5/85)

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impanelled.

(i) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

A. Ground one: The R.I.C.O. statute was unconstitutionally applied to an entire nation.

Supporting FACTS (state *briefly* without citing cases or law) The superseding indictment named the "Nation" of Yahweh as the racketeering enterprise. It is unprecedented to indict an entire nation of people for the acts of a few individuals. The indictment goes beyond Congressional intent, and is in violation of the Constitution.

B. Ground two: The R.I.C.O. statute was unconstitutionally applied to an entire religion.

Supporting FACTS (state *briefly* without citing cases or law): The superseding indictment named "the Yahwehs" as the racketeering enterprise. It is unprecedented to indict an entire religion under R.I.C.O. To indict an entire religion is in violation of the First Amendment and the Religious Freedom Restoration Act of 1993. Indicting an entire religion created a substantial burden upon the free exercise of religion for the alleged acts of a few individuals.

C. Ground three:

Supporting FACTS (state *briefly* without citing cases or law):

AO 243 (Rev. 5/85)

D. **Ground four:** _____

_____

**Supporting FACTS (state *briefly* without citing cases or law):** _____

_____

_____

_____

_____

_____

_____

13. **If any of the grounds listed in 12A, B, C, and D were not previously presented, state briefly what grounds were not so presented, and give your reasons for not presenting them:** _____

    N/A

_____

_____

_____

14. **Do you have any petition or appeal now pending in any court as to the judgment under attack?**
    Yes ☒ No ☐ Waiting to hear if the Supreme Court will grant certiorari.

15. **Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:**

    (a) At preliminary hearing  Alcee L. Hastings _____

    _____

    (b) At arraignment and plea  Alcee L. Hastings _____

    _____

    (c) At trial  Alcee L. Hastings and Wendellyn K. Rush _____

    _____

    (d) At sentencing  Alcee L. Hastings _____

    _____

AO 243 (Rev. 5/85)

(e) On appeal  Charles White and Ben Kuehne

(f) In any post-conviction proceeding  Charles White, Ben Kuehne, and/or Wendellyn K. Rush

(g) On appeal from any adverse ruling in a post-conviction proceeding  Ben Kuehne

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at approximately the same time?
Yes ☐ No ☒

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐ No ☒

(a) If so, give name and location of court which imposed sentence to be served in the future: _____

(b) Give date and length of the above sentence: _____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ☐ No ☐

Wherefore, movant prays that the Court grant him all relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed on

October 5, 1996
(date)

_Yahweh Ben Yahweh_
Signature of Movant

(7)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,
            Plaintiff

vs.                                    Case No. 90-868-Cr-Roettger

YAHWEH BEN YAHWEH, et al,
            Defendants

MEMORANDUM
FILED IN SUPPORT OF DEFENDANT,
YAHWEH BEN YAHWEH'S MOTION TO
VACATE OR SET ASIDE JUDGMENT, OR CORRECT SENTENCE

## I.     **INTRODUCTION**

Defendant's motion is filed pursuant to 28 U.S.C. Section 2255 seeking a determination that

the judgment and sentence imposed herein was in violation of the Constitution and laws of the United

States.

This memorandum will examine the unconstitutional application of the Racketeering Influence

and Corrupt Organizations statute to an entire nation and an entire religion, the substantial burden that

such application placed upon that nation of people and their faith. This memorandum also chronicles

events prior to the federal trial, as well as subsequent state trials and investigations that warrant a closer

examination through an evidentiary hearing to determine how these events may have undermined the

confidence in the verdict herein.

1

## II.   **FACTUAL BACKGROUND**

A.   Before the Federal Trial

Yahweh Ben Yahweh began his ministry in Miami in 1978.  That next year, 1979, his Hollywood, Florida, post office box was placed under surveillance by the Federal Bureau of Investigation.

That same year, 1979, undercover agents, Miami-Dade police officers, began attending the weekly Shabbath services held by the defendant, and continued with surveillance of the Temple headquarters when it opened in 1980.

There is no factual basis upon which to rely or believe that these surveillances ever ceased prior to the instant federal indictment, which was unsealed November 6, 1990.

During the defendant's bond hearing and a pre-trial status conference, government prosecutor, Richard Scruggs, advised this Court that a thorough investigation had been completed on the organization headed by the defendant and that the defendant had no money or property, nationally or internationally, held in his name.

Despite this thorough investigation, just weeks before the federal trial was scheduled to begin, the government empaneled a new grand jury which issued subpoenas to officers and ministers of the Temple of Love to question them about the structure, nature, and finances of The Temple of Love, The Nation of Yahweh, and the Yahwehs. Defense attorneys, who moved to quash subpoenas, complained that the government was utilizing a new grand jury to gain discovery for the trial which was about to begin.

When that trial finally commenced, the federal and state governments had explored and

2

scrutinized The Temple of Love, The Nation of Yahweh, and the Yahwehs for at least the preceding 11 years.

B.      Federal Indictment and Charges

In a superseding indictment, a federal grand jury charged Yahweh Ben Yahweh, in Count I, with conspiracy to commit RICO, in violation of 18 U.S.C. Section 1961(4); in Count II, with conducting and participating in the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. Sections 1962(c) and 1963; and in Count III, with obstructing, delaying and affecting interstate commerce through extortion, in violation of 18 U.S.C. Section 1951.

That superseding indictment, under Cause Number 90-868-Cr-Roettger, alleged that the enterprise, through which a pattern of racketeering activity was conducted, was "...a group known as the Yahwehs, also known as The Nation of Yahweh...and The Temple of Love, Inc."

The Nation of Yahweh is a sovereign people who share common customs, origins, history, culture, language and religious belief. The Yahwehs are a bona fide and recognized faith and form of spiritual expression. The separation between the two is synonymous with the separation between the race of Jews and Judaism.

All predicate allegations, said to have been committed in furtherance of the enterprise, involved acts of attempted murder, murder, and/or arson, each occurring on state or private property, over which the state had primary authority to prosecute.

Before trial, at various status conferences, Judge Norman C. Roettger took notice of the state's primary authority over the predicate acts, and asked why these state cases were in his federal court. His questions had not been answered during the trial:

> "The Court:  I have no idea about the workings of the United
> States Attorney's Office. **I still don't understand why**

3

>**this case is here.** I can't order you to do anything. That's pretty
>clear-cut."

(Trial Volume 36:7157)                                    (<u>emphasis added</u>)

Judge Roettger's questions were evidenced by defense counsel Rayfield McGhee's comment

on March 24, 1992:

>"Mr. McGhee: Judge let me just respond very briefly by
>saying...This was the Government's own doing...**this case...I**
>**agreed with the Court tacitly many times saying should not**
>**have been here."**
>(Excerpt from discussion outside presence of the jury on defense motion
>for severance.)

(Trial Volume 41:8322-3)                                  (<u>emphasis added</u>)

C.    Trial Results

Jury trial commenced on January 2, 1992.  On March 10, 1992, after the close of the

government's case-in-chief, Yahweh Ben Yahweh and co-defendant Judith Israel were acquitted of

obstructing, delaying and affecting interstate commerce through extortion under Count III by Judge

Roettger pursuant to Rule 29 of the Federal Rules of Criminal Procedure.

Verdicts were received on May 27, 1992.  Yahweh Ben Yahweh was convicted of Count I,

but received a mistrial as to Count II.  Sixteen defendants went to trial; 7 were convicted of

conspiracy; 7 were acquitted; 2 received mistrials; and 0 were found guilty under Count II.

While no special jury verdict forms were used, the facts pertaining to the disposition of each

racketeering act is noteworthy.  Of the 19 predicate acts alleged in the indictment, 17 were submitted

to the jury for deliberation (racketeering act #6 being dismissed before trial on the government's

motion, and racketeering act #19 being dismissed as part of the acquittals under Count III).  Five of

the submitted 17 acts  involved government witnesses Lloyd Clark, Ricardo Woodside, and/or

Anthony Solomon, and stemmed from the years 1981 and 1983 as alleged in the indictment

4

(racketeering acts #1 - #4 1981 & racketeering act #5 1983). Of the total eight defendants who were charged in those acts and who went to trial, six were found guilty of conspiracy under Count I; one was found not guilty; one received a mistrial; and not one of the eight was found guilty under Count II.

The remaining 12 acts of the total 17 involved Robert Rozier as the principal, if not the only, government witness, and each was alleged to have occurred in 1986 (racketeering acts #7 - #18). Of the thirteen defendants who were charged in those acts and who went to trial, six were convicted of conspiracy under Count I; six were found not guilty; one received a mistrial; and not one of the thirteen was found guilty under Count II.

Among the 12 acts involving Robert Rozier, 11 were constantly referred to by the government as the "white devil" killings. Judge Roettger announced, almost three years later, during closing arguments on defendant's motion for new trial (referred to as the "silver bullet" motion), the following consistency or pattern from the May 27, 1992, verdicts concerning these allegations and the government's witness, Robert Rozier:

> "The Court:    Well I notice **none of the** quote, **white devil murderers, were convicted**."
>
> Ms. Novicki:   That is correct, Judge.
>
>       Not people that were charged solely with that.
>
>       "The Court:    And Rozier was pretty much the only evidence against them. And rather **obviously the jury did not buy the theory of the inner circle or brotherhood having a membership prerequisite of killing a 'white devil.'**"

(3/29/95:27-8)                                    (<u>emphasis added</u>)

5

D.     Federal Sentence

Yahweh Ben Yahweh was sentenced on September 14, 1992 to 18 years in prison and a

$20,000 fine. His conviction and sentence is a pre-guidelines case, making him eligible for parole

release after serving one-third of his sentence. Yahweh Ben Yahweh's mandatory parole release date

is currently August 17, 2001. His sentencing occurred prior to the results of the subsequent state

trials.

E.     Subsequent State Trials

It was because of the number of acquittals and mistrials as detailed above, and because of the

obvious disposition of the "white devil" allegations, that the State of Florida, on the same day the

federal jury's verdicts were received, arrested Yahweh Ben Yahweh and five other federal defendants

on charges of first-degree, capital murder. Those arrests and charges were based on the same killings

alleged as predicate acts in the federal trial, and were considered the government's strongest of the total

17 racketeering acts - #14 the murder of Cecil Branch; #17 & 18 the murders of Anthony Brown and

Rudolph Broussard; and #2 the murder of Aston Green.

During the discovery process for those state trials, the answer to Judge Roettger's questions

as to why murder cases traditionally prosecuted in state courts were being tried in his federal Court

were finally answered.

It was learned that Chief Assistant Attorney Abraham Laser met with Metro-Dade homicide

detectives, and FBI agents (and subsequently with the United State's Attorney's Office) on January

25, 1988, and that it was recommended that the Florida State's Attorney's Office would cede its

jurisdiction to the United State's Attorney so that an umbrella type prosecution under the RICO statute

could be filed utilizing Robert Rozier's cooperation.

Mr. Laser's recollection of that meeting was recorded in his 12/01/92 deposition in the State of Florida vs Yahweh Ben Yahweh, Case Number 92-18645 (Snyder), at pp. 45-6 on the issue of double jeopardy:

> "The **primary consideration**, as I would like to think in which an evaluation of prosecution is a **proof question**. What were the elements of the particular crimes we were evaluating, and what proof could be offered as to any of those crimes. Clearly the **possibility of trying any one of these individual homicides** without being assured of a ruling on the Williams Rule issue, I felt **was going to be a difficult** area."
>
> (emphasis added)

Mr. Laser failed to mention that attempting to give jurisdiction to the federal government would also let the State of Florida avoid its liberal discovery rules, because these "individual homicides" could have been joined under Florida's RICO statute which provides a greater penalty than the federal RICO statute. (See: Fla. Stat. Section 895.01 et seq. whose criminal provisions closely follow the federal model and subjects any one convicted of a substantive violation with a first-degree felony.)

A secondary consideration was protection of cooperating witnesses. The State believed that protection for such witnesses could best be afforded through the federal witness protection program. What glaringly contradicts this secondary consideration is:

-  the identity of cooperating witnesses had already been made known during depositions and pre-trial matters in the civil RICO law suit filed in 1987 (Lloyd Clark, in particular, gave numerous names during his civil deposition; see Volume 48:9705-6);

-  Ricardo Woodside remained in contact with followers throughout his cooperation; his whereabouts were always a known fact;

7

-        Other cooperating witnesses, even as late as the first week of October 1996, remain in contact with followers and even still visit the believers; and no incident of threats or violence have ever been made against these individuals.

The jury that heard the first capital murder case (racketeering act #14) was presented the same evidence and the same witnesses by the same prosecutor as in the federal case. It also had the opportunity to view a video presentation of a class held in the Temple on which Yahweh Ben Yahweh chastised Robert Rozier for his ill-morals and bad character. The verdict was decided in less than two hours of jury deliberation -- NOT GUILTY.

The very next day, December 18, 1992, the Dade County State's Attorney's Office dismissed the second capital murder case (racketeering acts #17 & #18) against Yahweh Ben Yahweh and co-defendant, Carl Perry.

But the dismissal of this second state case was not without event. Carl Perry, who had received a mistrial in the federal case and who had been released on his on recognizance by Judge Roettger pending any new trial, applied for release on bond after he was arrested in the state case. That application was granted but appealed by the state. The third District Court of Appeals made a specific finding upholding the state court's finding that the proof of guilt was not evident due to the substantial impeachment of Robert Rozier's claim that anyone--other than he--was involved in the murders of Brown and Broussard. Specifically the Third District held that:

> "Although perhaps the state's evidence may have been sufficient to withstand a motion for judgment of acquittal at trial based solely on the testimony of the alleged accomplice [Rozier], it is also clear that the impeachment evidence adduced below (1) contradicted the alleged accomplice's testimony by tending to show that the alleged accomplice alone committed the charged double homicide, and (2) contradicted the alleged accomplice's version of the double homicide on material matters. The trial court was entitled to conclude that this impeachment evidence

8

was substantial in nature and was not refuted by corroborating evidence of
guilt; this being so, the trial court properly concluded that the state had
failed to establish that the proof of guilt was evident or the presumption of
guilt great. Van Eeghen; Russell; Mininni. Indeed, the state's case was so
weak, in view of this impeachment evidence, that Judge Roettger released
the respondent on his own recognizance after the jury was unable to reach
a verdict in the related federal RICO prosecution."

State v. Perry, 605 So. 2d 94 (3rd DCA Fla. 1992), at 99.

As to the third first-degree murder charge to result from the federal trial (racketeering act #2),
the Aston Green murder, subsequent state discovery revealed that Dade County Chief Medical
Examiner, Dr. Joseph Davis, who was the government's witness during the federal trial and was
scheduled to be the state's witness, was of the opinion that the physical evidence in this case was not
consistent with the government's version of the events in the federal trial. This revelation was so
compelling, and so completely discrediting to the witnesses--Clark and Woodside--that the State
Attorney's Office immediately offered to reduce the capital murder charge against defendant, John
Foster, to a no contest plea and credit for time served with an immediate release from jail. There was
no supervision required or any further contact with the court or the government. Significantly,
Yahweh Ben Yahweh was not charged in state court with any participation in this murder.

It is apparent, from a thorough and detailed review of these subsequent state cases, that the
federal case was not at all that it purported to be. All of the allegations in the federal case were made
by ex-followers of The Temple of Love who each had a motive to lie. The record of the trial is replete
with obvious admissions from these ex-followers that they sought vengeance against the defendant,
or that they received compensation or leniency from the government for their testimonies. Some even
admitted that they lied in their pre-trial statements to make their stories more interesting to the
government.

9

The subsequent state trials exposed further weaknesses of the governments` witnesses. Exemplary of this fact is the discrediting of Clark and Woodside, as well as the complete destruction of Rozier's credibility: Robert Rozier's "story" of "white devil killings" and a "brotherhood" were not bought by the federal jury; his "story" that Yahweh Ben Yahweh had directed him to kill Cecil Branch was not believed by a state jury; and he was deemed utterly impeached and uncorroborated by the Third District Court of Appeals.

F.     The Pittsburgh Cases

Having failed to achieve its goal in the federal case, the government ceded to the state for its later attempt at first-degree capital murder cases. But again, the results were far below the prosecutor's goal.

Not to be outdone, the prosecutors--both now promoted to positions within the Justice Department--took advantage of one last attempt at seeking a life sentence or the death penalty for Yahweh Ben Yahweh or any of his present or ex-followers.

During a lengthy hearing on defendant's motion for new trial, the defendant's son and daughter-in-law, Hulon and Pauline Mitchell, became cooperating witnesses for the government. They, too, were motivated by revenge against The Nation of Yahweh when they were removed from a leadership position at the Barclay Hotel in Atlanta, Georgia.

The son's cooperation led to the November 1995 arrests of four present and ex-followers for a 1986 Pittsburgh murder and attempted murder. The allegations against these four men were originally provided to Pittsburgh authorities by one, Robert Rozier. (Note: Robert Rozier was in the Pittsburgh area at the time of these offenses.)

Even with the new allegations from a new cooperating witness, Pittsburgh prosecutors, who

10

declined to prosecute the case in 1988, were still reluctant to proceed with the case, but were encouraged to indict and try the case by phone calls from former Dade County Assistant State's Attorney, now Assistant U.S. Attorney, Gertrude Novicki and former Assistant U.S. Attorney and then Assistant Attorney General, Richard Scruggs.

The following chronological series of events show the real intent of these prosecutors and unambiguously suggests a hidden agenda for bringing even the original case against Yahweh Ben Yahweh:

1994

**June 6th** . . . John Foster takes an unprecedented plea offer.

**June 19th** . . .Hulon Mitchell III leaves the Barclay Hotel with his wife, Pauline Mitchell, who resigns as the hotel's general manager after it is learned she may have been stealing cash receipts.

**June 21st** . . . Scruggs visits Atlanta to speak with Hulon regarding statements made to him by followers implicated in the Pittsburgh murder. Hulon also makes sworn statements to Detectives Rex Remley and John King about the Pittsburgh murder and about his father, Yahweh Ben Yahweh.

**June 30th** . . . Reports indicate that Hulon and Pauline Mitchell testify before a grand jury in Miami regarding Yahweh Ben Yahweh and "the workings" of The Nation of Yahweh.

**September** . . . Hulon Mitchell III contacts Uriah David Israel at the Barclay Hotel and informs Israel that Hulon and Pauline have talked with Remley, Scruggs, Novicki, and the FBI. Hulon further relates that the FBI is looking for three present and ex-followers for a murder in Pennsylvania (city not mentioned) who they may get to give statements against each other and against Yahweh Ben Yahweh; that Scruggs and Novicki are concerned that Roettger might grant the "silver bullet" motion and that they "need something to alter what might happen." (The "silver bullet" motion refers to the motion for new trial that this Court held hearings on, beginning in March 1994 and continuing through December 1994.)

**November 10th** . . . Amon Israel (Detroit), Elisha Israel (Jacksonville), Elijah Israel (Miami), and Enoch Israel (Miami) are arrested; and just as reported, each man is interrogated intensely about Yahweh Ben Yahweh and his teachings. During their interrogations, they are instructed that if they would only say that Yahweh Ben Yahweh ordered the murder, a deal could be offered to minimize their punishment.

11

<u>1995</u>

**February** . . . The men arrested in November 1994 resist offers to plea bargain, and maintain their innocence. Each is extradited to Pittsburgh, Pennsylvania, to stand trial. Their preliminary hearings are scheduled for April 27, 1995.

**April 5th** . . . Wende Rush, one of the defense attorneys for Yahweh Ben Yahweh, whose credibility became material during the "silver bullet" motion hearings, returns a phone call from Atlanta FBI agent, Bill Gant (Gant is the FBI agent mentioned in discovery handed over for the Pittsburgh case), who wants to schedule an appointment with Rush to discuss her possible knowledge of threats made against Scruggs.

**April 5th** . . . Judge Roettger issues his written order denying the "silver bullet" motion.

**April 10th** . . . Astonishingly, the case against Elijah Israel, who had numerous witnesses that he was in Miami on the day that the murder occurred in Pittsburgh, and who had been informed by detectives that questioned him that "we know you are not involved, but just tell us what your brother (Enoch Israel) told you," is dismissed by Pittsburgh Prosecutor Chris Conrad. Conrad cites "lack of evidence" as his reason for the dismissal, and states in the presence of Attorneys Jayne Weintraub, Steve Potolsky, Gary Zimmerman, and Wende Rush that he regrets not having dismissed the case sooner.

**April 13th** . . . FBI agents visit the apartment complex where some of "the Yahwehs" live in Miami looking for four followers who agents state are "not in trouble, but we've heard there might be threats against them, and we want to help them." The agents refuse to leave their cards, but security records the license number of the van they are driving.

**April 24th** . . . FBI cancels scheduled interview with Wende Rush because they have a lead in the Oklahoma bombing case.

**April 25th** . . . An inmate at Lewisburg Penitentiary, who studies the teachings and writings of Yahweh Ben Yahweh, is visited by FBI agents from Washington, D.C., and questioned where he gets his reading materials from, what Yahweh Ben Yahweh teaches, and how have his studies changed his life.

Pittsburgh Prosecutor Conrad begins to question the government's motive for providing the statement of Hulon Mitchell III. Scruggs advised Conrad that the reason the federal case against Yahweh Ben Yahweh was so important to the government was that "they were convinced that Yahweh Ben Yahweh would run for President in 1996 and had to be stopped."

**April 26th** . . . During the meeting between prosecutors and defense attorneys in preparing for the preliminary hearing in Pittsburgh, it is learned that the FBI in Atlanta phoned the FBI in Pittsburgh to alert them that a bus load of "Yahwehs" were scheduled to arrive for the hearing. No such plans existed. Agents in Pittsburgh then called Conrad to inquire if the courthouse may need extra security.

1995 (continued)

Conrad denied any need for additional security.

**April 27th** . . . Defense attorneys are surprised to learn at the preliminary hearing that Prosecutor Conrad is dismissing the cases against the remaining three men because of a witness problem and "lack of evidence." The three men are released from the Allegheny County Jail without ever naming Yahweh Ben Yahweh as a codefendant.

The results of these subsequent state cases--in Florida and Pittsburgh-- also demonstrate that there was some added ingredient in the federal case that gave it its cloak of importance. That missing ingredient was the unprecedented allegation of an entire nation of people and an entire religion as a racketeering enterprise in a RICO indictment, which allowed an unconstitutional and substantial burden to be interjected onto The Nation of Yahweh. This caused prejudicial error.

### III.   **MEMORANDUM**

#### NAMING THE NATION OF YAHWEH AS AN ENTERPRISE IS AN UNCONSTITUTIONAL APPLICATION OF RICO TO A SOVEREIGN NATION IN VIOLATION OF FIRST AMENDMENT RIGHTS AND DUE PROCESS

The RICO conspiracy alleged in this case described The Nation of Yahweh as the racketeering enterprise. The Nation of Yahweh is a sovereign group of people who share common customs, origins, history, language, culture, and religious belief.

It was the institution of slavery that stripped that nation of the knowledge of itself, prohibited the wearing of cultural garments, enjoined the use of their language, forbade the use of their birth names, and outlawed the worship of their God.

When the ancestors of those persons, who are today called "blacks" or "African-Americans," were kidnaped from their land, they did not cease being a nation simply because they could no longer

13

return to their homes, their country, or their territory.

A nation is defined as "an aggregation of persons speaking the same or cognate language and usually sharing a common ethnic origin." (See Webster's Dictionary of the English Language, p. 634.) A nation may usually, but not necessarily, inhabit a distinct portion of the earth or live under the same government or sovereignty. (See Blacks Law Dictionary, 5th Edition, 1979, p. 923.) The United Nations recognizes that a nation can be without a "land."

Becoming slaves did not deny the descendants of those captured and brought to North America and the Western Hemisphere the right to reclaim their tribal heritage, to use their ancestral nomenclatures, and to declare their sovereignty from the descendants of those who captured them.

What stands in the way of those descendants is remembering and acknowledging who they are, what their language is, what their common cultural distinctions are, and who their God is.

Yahweh Ben Yahweh helped a large number of the descendants of former slaves to research and discover that the country from which their ancestors were kidnaped is a portion of Northeast Africa, of which a small part is called Israel; that their common history is found in the Bible; that their distinctive cultural garments are described in the Bible; that their language is ancient Hebrew; that their birth names are derived from ancient Hebrew; that their common surname is Israel; that they are Hebrew Israelites; that they are from the tribe of Judah; that their God is יהוה (YAHWEH); and that they are His nation.

The government, however, attempted to make that nation out to be a criminal organization, with no basis of factual existence. The government failed, through its own miseducation, to acknowledge that a number of people of color worship under the ancient form of Judaism, such as the Falasha Jews. This proves that at least some of the ancient tribes of Israel were black.

14

**It is unprecedented for an entire nation to be named as a racketeering enterprise**. The court, in upholding this unprecedented application of the RICO statute, created prejudicial error. While this Court and other courts have permitted a wide range of legitimate enterprises to be named as the vehicle through which racketeering acts are committed, (see *Turkette, Zielie*, and *Bagaric* cited in the proceeding argument), "RICO's liberal construction clause...is not an invitation to apply RICO to new purposes that Congress never intended." *Reves v. Ernst & Young*, 113 S.Ct.1163, 1172 (1993).

Framers of the RICO statute never intended that a RICO indictment be permitted to voice personal opinions of the prosecution as it seeks to present its theory of a case. During his opening arguments, United State's Attorney, **Richard Scruggs, stated**, over defense objection, that **Yahweh Ben Yahweh gathered money and gathered followers "...by convincing the followers or people in the community that they were black Hebrews.**" Scruggs' choice of words was no accident. He was suggesting to the jury that these "followers or people in the community" were not Hebrews, but persons who had to be **persuaded, induced, fooled**, and **prompted into believing** that they were Hebrews by Yahweh Ben Yahweh. He was further suggesting that these persons became the participants in a criminal organization and enterprise because of that **forced** belief.

The Court held that Scruggs' comments did not rise to the level of prosecutorial misconduct that could not be handled through a curative instruction. See *United States v. Bagley*, 473 U.S. 667 (1985); *United States v. Lopez*, 898 F.2d 1505 (11th Cir. 1990). Yet the Court did admonish the prosecution that his comments were improper for an opening statement (Volume 1:109). **Scruggs was seeking to mock and condemn the "followers or people in the community" who could accept that he/she is a Hebrew Israelite or a "true Jew."** The record cannot record the inflection in a

voice or facial expression. (Volume 1:98-109; side bar objection and discussion on improper, inflammatory comments during opening statements.) **Statements of a prosecutor will justify reversal** of a conviction if they undermined "the fairness of the trial and contributed to a miscarriage of justice." *United States v. Obergon*, 893 F.2d 1307, 1310 (11th Cir.), cert. denied, 494 U.S. 1090, 110 S.Ct. 1833 (1990). Furthermore, a **prosecutor's statements require reversal** if "the comments are both improper and prejudicial to a substantial right of the defendant." *United States* v. *Jacoby*, 955 F.2d 1527, 1541 (11th Cir. 1992), cert. denied, 113 S.Ct. 1282 (1993). **Scruggs' comments were offered to not only burden and belittle the defendant, but to also burden and belittle any and all citizens of The Nation of Yahweh.**

Congress also never intended that an entire nation be held responsible for the acts of individuals. In fact, Congress never intended RICO culpability to extend beyond those who participate in the operation of a racketeering enterprise (see the proceeding discussion).

What clamor arises when blanket comments or innuendos are made such as all white people are racists; all South Americans are drug smugglers; all Frenchmen are rude; or that all Germans embraced Hitler's racist views and are culpable for his atrocious crimes. **The suggestion from the prosecutor's comments is any "black" that would say that he/she is a "true Jew" will also eagerly participate in a criminal act**. Such a suggestion is a deprivation of a substantial right of liberty to believe as one chooses.

The freedom to believe is absolute. The prosecutor's comments in opening statements could have been permissible, and not have violated that absolute right, under only one scenario--if Scruggs hoped that the evidence would show that (1) Yahweh Ben Yahweh "fooled" and "conned" people into believing they were Hebrew Israelites as part of a scheme to amass wealth or gain power and (2)

16

that citizens of The Nation of Yahweh are in fact neither "true Jews" nor Hebrew Israelites.

**No proof** was ever offered through the five-month long trial that those "followers or people in the community" are not Hebrews exiled in America. **No proof** was ever established that "blacks" and "African-Americans" are not Hebrew Israelites and citizens of The Nation of Yahweh. In fact, the government **never intended to offer any such proof**.

Instead, the prosecutor's comments were irrelevant to the allegations that had to be proven beyond a reasonable doubt, and to the prosecution's theory of the case. **These were not cases involving murders and arson because the victims "claimed" to be "true Jews."**

The government's theory of its case was that the pattern of racketeering activity fell into three categories: (1) acts that were committed against dissident followers; (2) acts that were committed against persons in the community who interfered or obstructed the efforts of the group to sell products, acquire property and/or solicit donations; and (3) acts that were committed by members of the "brotherhood."

The government also asserts that it could not go forward with its case without introducing religious teachings and background on the nature and characteristics of The Nation of Yahweh, and that the probative value of such evidence far outweighed any prejudicial effect on the group.

By the government's own admissions, in trying to prove an affect on interstate commerce, the publications of The Temple of Love and tapes of Yahweh Ben Yahweh's teachings were shipped across the country to more than 40 Nation of Yahweh congregations on a weekly basis; yet, all of the allegations that were submitted for the federal jury's consideration dealt with acts committed in the Miami area. **If the teachings and publications were used by Yahweh Ben Yahweh to control and exhort his followers to do bad acts, why wasn't the jury considering "bad acts" in more than**

17

**40 locations across the country?**  The government had the testimony of ex-followers who gave direct testimony that Yahweh Ben Yahweh "told" them to do bad acts, which made evidence of the nature and characteristics of The Nation of Yahweh irrelevant to any prosecution issue.  The government never showed any causal connection between Yahweh Ben Yahweh "taught me I was a Hebrew Israelite" and the indictment's predicate acts.  After all, there is a wide distinction between "I was taught so I did" and "I was told to do."  Moreover, the "indoctrinated" or "brainwashed" excuse for one's actions has never been accepted by any court of law.

"Wearing distinctive white garments," denouncing a "slave name," and believing themselves to be descendants of the ancient Hebrew Israelites, each has no relevance to the government's case theory and its burden of proof.

The government could have met its burden of proof without naming the entire Nation of Yahweh as the racketeering enterprise (see proceeding argument on less restrictive means).

### NAMING THE "THE YAHWEHS" AS A RACKETEERING ENTERPRISE IS AN UNCONSTITUTIONAL APPLICATION OF RICO AND VIOLATES FUNDAMENTAL RELIGIOUS FREEDOMS

The superseding indictment herein alleged that the racketeering enterprise of the RICO conspiracy was "the Yahwehs."  The prosecutor, Richard Scruggs, in his opening statements commented, "You are going to hear the 'so-called' religion, known in various names, is a mixture of Hebrew and Jewish culture and religion with a dash of black Muslim and a little bit of overlay of the Masons." (Volume 1:34)  This characterization of "the Yahwehs" was deliberately uttered by the government in an effort to paint the faith as a sham and absurdity whose founder, members, and

followers are patently devoid of religious sincerity-- a masquerade designed to obtain First Amendment protection.

Objections to this description were overruled by the Court, and the labeling of "the Yahwehs" as the racketeering enterprise was upheld over defense motions to dismiss.

Never before in the life of RICO has an entire religion been alleged and held to be a racketeering enterprise, notwithstanding its firm roots as a bona fide and recognized faith. (See Melton, G.J., *The Encyclopedia of American Religions* 147 [1989], and *Lawson v. Dugger*, 844 F. Supp. 1538 [S. D. Fla. 1994].)

A wide range of legitimate entities have been alleged as racketeering enterprises, but never before has organized religion been put on trial in such a manner. See *United States* v. *Turkette*, 452 U.S. 576, 580, 587, 101 S.Ct. 2524, 2527, 2530, 69 L. Ed.2d 246 (1981); *United States* v. *Zielie*, 734 F2d 1447, 1463 (11th Cir. 1984), cert. denied, 469 U.S. 1189, 105 S. Ct. 957, 83 L. Ed.2d 964, and cert. denied, 469 U.S. 1216, 105 S. Ct. 1192, 84 L. Ed.2d 338 (1985). Benevolent and nonprofit organizations, unions, benefit funds, governmental units, courts and judicial offices, police departments, and motorcycle clubs are but a few of the entities that have been upheld as RICO enterprises. Yet even these legitimate organizations are not characteristic of the very basis for First Amendment religious protections.

Labeling an entire religion as a racketeering enterprise is an unconstitutional application of the RICO statute and its very purposes. RICO's major purpose was to attack the infiltration of organized crime and racketeering into legitimate organizations. *Reves* v. *Ernst & Young* at 1173. It was never intended to extend liability beyond those who participate in the operation or management of an enterprise through a pattern of racketeering activity. *Id* at 1172.

19

While courts have frowned on efforts to place artificial limits on what constitutes a pattern of racketeering activity, *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989), the application of the racketeering enterprise and pattern elements to an admittedly legitimate religion is far beyond the contours of the RICO statute.

The application of RICO to "the Yahwehs" directly conflicts with the fundamental principle respecting religious freedom as set out in the *Religious Freedom Restoration Act of 1993*. Pub.L. No. 103-141, 107 Stat. 1488 (42 U.S.C. Sections 1988 & 2000bb-2000bb-4).

On July 12, 1995, President Bill Clinton, in his remarks on religious liberty in America stated:

> "Religious freedom is literally our first freedom. It is the first thing mentioned in the Declaration of Independence. And as it opens, it says Congress cannot make a law that either establishes a religion or restricts the free exercise of religion.
> What does it mean for a government to establish a religion, and what does it mean for a government to interfere with the free exercise of religion. The RFRA was designed to clarify the second provision -- government interfering with the free exercise of religion and to say you can do that almost never. You can do that almost never.
> ...[O]ne of the proudest things I've been able to do as President was to sign into law the RFRA in 1993. And it was designed to reverse the decision of the Supreme Court that essentially made it pretty easy for government, in the pursuit of its legitimate objectives, to restrict the exercise of people's religious liberties. This law basically said -- I won't use the legalese -- the bottom line was that **if the government is going to restrict anybody's legitimate exercise of religion they have to have an extraordinarily good reason and no other way to achieve their compelling objective other than to do this. You have to bend over backwards to avoid getting in the way of people's legitimate exercise of their religious convictions. That's what the law says.**
> With the RFRA we made it possible, clearly, in areas that were previously ambiguous for Native Americans, for American Jews, for Muslims to practice the full range

20

> of their religious practices when they might have otherwise
> come in contact with some governmental regulation."

(*James Madison High School, Vienna, Virginia 7 12 95*)          (emphasis added)

In enacting the RFRA, Congress expressly found that "governments should not substantially burden religious exercise without compelling justification[.]" 42 U.S.C. Section 2000bb(a)(3). Under the RFRA, limitations on free exercise of religion are generally prohibited and can **only** be substantially burdened, **only** if it is demonstrated that the application of the burden to the individual:

> -        is the furtherance of a compelling
> governmental interest; and
> -        is the **least restrictive** means of
> furthering that compelling governmental interest (42
> U.S.C. Section 2000bb-1)

While members of a religious organization are not immune from prosecution under RICO, defining an enterprise as an organized religion is not only an attack on religious freedoms, but also a substantial burden to an individual's exercise of religion. Never should the acts of individuals who admit RICO liability extend to the whole, entire group.

Both the trial court and the appellate decision of the 11th Circuit recognize this principle and the substantial burden on the whole for the acts of a few:

> "The Court:    I have found it interesting as
> the trial progressed to learn more about the
> religion as espoused and preached by the
> defendant and **I do not cast aspersions upon
> it or the beliefs of any body who follows the
> Nation of Yahweh.**"

(Volume 74:16)                    (emphasis added)

> "Not all the members of the Temple
> supported or were engaged in the homicidal activities
> that are the subject of this case. **But there is a distinction
> between the conspirators in this case and the general**

> **population of the Temple.  We recognize and stress this
> difference.**...This case is not the prosecution of a religion.
> The religion had adherents who never became involved in
> illegal activity and who were not implicated in this conspiracy."

(Appellate Decision at page 16, note 8)                    (emphasis added)

Regardless of  both Courts' attempts to distance the "religion" from the prosecution of

individual conspirators,  the naming of  "the Yahwehs" as the racketeering enterprise had the factual

result of labeling all followers and members as unindicted co-conspirators.

The prejudicial error that occurred when both Courts upheld this unprecedented use of RICO,

can be demonstrated by the substantial burden heaped upon individuals not implicated in the RICO

conspiracy; for example -- a Miami nurse who was threatened with losing her job because she chose

to wear her diadem (white head wrap) instead of a cap, which had been "okay" prior to the trial -- a

South Floridian defense witness who was fired from her secretarial job when it was learned that she

would be testifying for the defense and was a member of the "faith" -- the Birmingham, Alabama

couple whose competency as parents was attacked and challenged in court because they chose to teach

their children at home and to pass their beliefs to their children -- the Army officer who was harassed

for "belonging to the black KKK" -- the follower who was arrested for the alleged Pittsburgh murder

and detained unlawfully  and maliciously when police officials and prosecutors knew he was not

named by their own witnesses as having participated in the offense.

The Courts' distinctions came too late for these and numerous other individuals who did not

sit in on the trial, but read media accounts of a religion, their religion that was accused of being a

racketeering enterprise.

These individuals' exercise of religious freedom was substantially burdened, when the

government's compelling interest to prosecute criminal activity could have been furthered by a **least**

22

**restrictive** means.

The government contends that it has no legal requirement that it elect to more narrowly define the enterprise. The RFRA and the First Amendment, however, are the legal requirements that the government has overlooked.

The government further contends that even if it were required to narrow the definition of the enterprise, the case would be more difficult to prove. As an example, the government claimed that it could possibly narrow the enterprise to "a group associating in fact called the Brotherhood," which would cover the 1986 racketeering acts, but cause them to eliminate several other racketeering acts such as the "hypocrite murders." (In actuality, the elimination of the "hypocrite murders" from the indictment would only affect five of the total 19 acts charged.)

But the government failed to thoroughly examine its case to see how it could uphold the legal requirements not to abuse an entire religion and an entire nation with its prosecutorial powers, and at the same time further its compelling interest to prosecute alleged criminal activity.

That **less restrictive** means to further the government's interest and avoid the complained of prejudicial effect can be seen by simply examining each of the alleged racketeering acts -- without admitting culpability as to any defendant -- even in the light most favorable to the government:

| #1 | Attempted homicide of Eric Burke. |
|---|---|
| | - Clark and Woodside were sent from **the Temple** to do the act. |
| #2 | Homicide of Aston Green. |
| | - Victim was beaten unconscious at **the Temple** and body transported from **the Temple**. |
| #3&4 | Homicide of Carlton Carey and attempted homicide of Mildred Banks. |
| | - Solomon testified "killers" were seen leaving **the Temple**. |

23

#5                  Homicide of Leonard Dupree.

    -               Said to have happened at **the Temple**.

#7&8                Homicide of Glendell Fowler and Kurt Doerr.

                     Rozier testified he was sent from **the Temple** to kill a white devil.

#9                  Delray Beach arson.

    -               The plan to fire bomb was said to have been made at **the Temple**.

#10                 Homicide of Clair Walters.

    -               Recount of murder said to have occurred at "brotherhood" meeting at **the Temple**.

#11                 Homicide of James Myers.

    -               Talked about during "brotherhood" meeting held at **the Temple**.

#12                 Homicide of Lyle Bellinger.

    -               Rozier told about murder by "killer" at **the Temple**.

#13                 Homicide of Raymond Kelly.

    -               Rozier and co-defendant left **the Temple** to go commit act.

#14                 Homicide of Cecil Branch.

    -               Victim's girlfriend came to **the Temple** to tell who "kicked" girl; killers dispatched from **the Temple**.

#15                 Homicide of Harry Byers.

    -               Killing described at "brotherhood" meeting at **the Temple**.

#16                 Homicide of Reinaldo Echevarria.

    -               Rozier learned about killing at **the Temple**.

#17&18              Homicides of Anthony Brown & Rudy Broussard.

24

Meeting to plan killings held at **the Temple**.

The Temple of Love, Inc., is not a religion, it is not "the Yahwehs," and it is not "The Nation of Yahweh." It was a legitimate "religious" organization established by a few citizens of The Nation of Yahweh. The indictment could have alleged **"the temple"** as the racketeering enterprise.

The superseding indictment did not read "The Nation of Yahweh" or "the Yahwehs" or The Temple of Love, Inc." It read **and** all of these entities. The government didn't expand its definition in hopes that one or the other entity would be found to be the racketeering enterprise by a jury. It indicted each <u>and</u> every entity as <u>the</u> enterprise. This is prejudicial to the very existence of the Nation and of its beliefs.

The government recognized this distinction, and The Temple's connection to all of its racketeering acts, but elected to widen its definition of the racketeering enterprise with "The Yahwehs" and "The Nation of Yahweh."

Evidence of religious teachings of the Yahwehs and the characteristics and nature of The Nation of Yahweh were introduced at trial by the government, **so it asserts,** to explain the background of the organization and the defendants' motives in engaging in the racketeering acts.

Such evidence was surplusage and offered to inflame the jury and to malign the group and its faith. Such a wide definition of a racketeering enterprise has purposely not been used in other cases.

RICO has been applied to a subset of actors within an organized religion, as was the case in *United States v. Dickens*, 695 F.2d 765 (3rd Cir. 1982), cert. denied, 482 U.S. 1092 (1983), involving a group of Muslims who practiced armed robbery, and *United States v. Brown*, 823 F.2d 591 (D.C. Cir. 1987), in which the enterprise was alleged as a group of individuals associated in fact which operated within the framework of a large group, avoiding any negative aspersions against the

25

entire organized religion (convictions were achieved in both cases, and the *Brown* case was reversed on other grounds).

Because the government did not solely charge the Temple, or a particular group of "Yahweh" members, but branded the entire religion as a racketeering enterprise, there is little doubt that it was the government's intention to destroy **an entire religion**–a religion, both personally and professionally offensive to prosecutors.

This is more than a "substantial burden" on the exercise of religion in that the government's approach significantly inhibited or constrained conduct manifesting a central tenet of the Yahwehs' religious beliefs and denied its membership the reasonable opportunity to pursue their chosen faith. See *Werner v. McCotter*, 49 F.3d 1476, 1480 (10th Cir.) cert. denied, ___ U.S. ___, 115 S. Ct. 2625 (1995); *Bryant v. Gomez*, 46 F.3d 948 (9th Cir. 1995).

## IV.    CONCLUSION

In conclusion, certain factors make the case of the United States of America versus Yahweh Ben Yahweh different from others most often brought before this Court.

First, the federal and state governments had 11 years of surveillance of the defendant, the basis for and results from such has yet to be fully disclosed.

Second, the cases began as state investigations, and when they grew promise of being prosecutable, the State chose to send them, along with its prosecutor and lead detectives, to the federal court, for a number of reasons, not the least of which was to avoid liberal state discovery rules.

Third, the case proffered by the federal prosecutors to the Court was not all of what it was purported to be. As the trial progressed, the Court recognized that certain of the prosecutors' attempts

26

at maligning the religion in this cause had to be stopped through sustaining defense counsels' repeated objections and through instructing the jury that the defendants' faith was not on trial. However well intentioned, these were insufficient curative measures. The damage had already been done.

The Judge could see the holes in the government's case. He correctly predicted a number of acquittals in the case (Volume 47:9406-7); dismissed Count III of the indictment under Rule 29 of the Federal Rules of Criminal Procedure; and released two defendants, with "hung" decisions, on their own recognizance awaiting any new trials.

**One can only imagine how the judge would have ruled on the defendants' Rule 29 motions had he known that his federal court was a tool for the State of Florida.**

Fourth, prosecutors, dissatisfied with the federal trial results, returned to the state forum, indicting their best federal predicate acts as first-degree murder cases. The verdicts and dispositions in those state cases were equally, if not more, disappointing to the government; especially since its star witness, and two of its key witnesses were thoroughly discredited. Prosecutors were, again, unsuccessful in the Pittsburgh cases.

Fifth, the Court sentenced the defendant, Yahweh Ben Yahweh, prior to the results of the subsequent state cases.

Finally, and most importantly, for want of a prosecution that could survive solely on the merits and facts of the case, the government--for the first time in judicial history--named "...a group known as the Yahwehs, also known as The Nation of Yahweh...**AND** The Temple of Love, Inc.," as the racketeering enterprise, violating both a nation and its citizens' fundamental and absolute rights to believe as each chooses, and an entire religion's right to freely exercise their faith, when a **less restrictive means existed** to further the government's compelling interest to prosecute a few persons

27

involved in criminal activity. The distinction between that nation, that religion, and those few persons was recognized and commented on by the trial and appellate courts post trial, again, too late to cure the prejudicial error that occurred by this unconstitutional, unprecedented application of the RICO statute.

WHEREFORE, for the reasons stated herein:

1.     this Court should, after an evidentiary hearing, enter its order vacating or setting aside the judgment and sentence in this cause;

2.     should grant the movant's request for discovery as to the issues raised in this motion;

3.     should in the alternative, bring the movant before this Court  and re-sentence the movant pursuant to the results of subsequent state cases and chronicled events that undermine confidence in the verdict herein, and diminish the import of the federal RICO case; and

4.     afford the movant any and all other relief to which he may be entitled.

Respectfully submitted,

YAHWEH BEN YAHWEH, Pro Se
Federal Register Number 22031-0034
USP Lewisburg
P.O. Box 1000
Lewisburg, PA  17837